**Alexander Dubinka, Plaintiff and Counterdefendant, Appellee, v. Theresa Dubinka, Defendant and Counterplaintiff, Appellant.**

**Gen. No. 52,981.**

First District, Fourth Division.

June 26, 1970.

Julius L. Sherwin and Theodore R. Sherwin, of Chicago (Sherwin and Sherwin, of Chicago, of counsel), for appellant.

Melvin A. Weinstein, of Chicago, for appellee.

MR. PRESIDING JUSTICE STAMOS delivered the opinion of the court.

Theresa Dubinka, defendant, appeals from a decree for divorce in favor of Alexander Dubinka, plaintiff, on the grounds of adultery and desertion.* The decree also granted custody of their son and an award for his support to Theresa Dubinka, but barred her from alimony, dower and all other rights arising from the marriage and dismissed her complaint for want of equity.

The issue presented for review is whether the decree is against the manifest weight of the evidence.

EVIDENCE

THERESA DUBINKA, called as a witness on her own behalf, testified:

She married plaintiff on April 21, 1951, and their son was born on March 15, 1952. During the last year of the marriage (1965), the plaintiff would either arrive home between 11:00 p. m. and 2:00 a. m. or 3:00 a. m., or sometimes not at all. His office closed at 5:00 p. m., but he would patronize taverns. Initially, there were "no regular intervals," but after five years of marriage he embarked upon a course of conduct that commenced with one night a week which he selected as his night off. Plaintiff gradually enlarged it to two nights and eventually five nights a week.

Plaintiff would telephone her occasionally as he did once in 1965. When he called, she could hear music in the background, glasses clinking and "he would just talk silly." Occasionally, plaintiff would put someone else on the phone and they "talked just silly, like, drunk like." When plaintiff did arrive home, he would

---

* The wife filed a complaint for separate maintenance on May 16, 1966, and on May 23, 1966, the husband filed his complaint for divorce alleging adultery, then both parties filed supplemental complaints charging the other with desertion. The causes were then consolidated and after a bench trial, the foregoing decree was entered.

grope his way to the couch and stay there until morning. He drank constantly which made him stagger and slur his speech, while "ordinarily he is a dignified man." Sometimes, when plaintiff was no longer sleeping in her bedroom, he would come in the room, turn on the lights and make noises. At the time of the trial, they had been separated about a year and a half. On one occasion plaintiff brought two friends home. He and his friends laughed, giggled and played cards all night. However, plaintiff went to work in the morning.

As a result of this conduct, she became very ill, extremely nervous and lost weight. She had no appetite and experienced dizzy spells. She received medical treatment for over a year and is still taking medicine.

Their son never saw his father during the week. On Saturday, plaintiff would sleep all day and would never take their son or her out. On April 16, 1965, he called and advised her that he had moved out. Plaintiff also stated that he was selling the automobile which was her property, but was in his name. She never gave plaintiff cause to leave.

Cross-examination revealed:

When she met her husband, he was an assistant manager for a small loan company. After their marriage, he became a manager at another loan company, eventually attaining the position of sales manager which required that he entertain customers. For more than a year before plaintiff left her, he never took her any place. However, she learned to play bridge and visited Lake Geneva with a girl friend.

She met a Mr. Cipriani during a visit to the library. The next time she met Cipriani was in a restaurant where they had coffee. She also met him at Lake Geneva during the summer before she and plaintiff separated. She did not recall how many times she visited Cipriani's apartment. Once she was alone in his apartment with him, but could not remember the latest

hour she ever remained. She denied ever spending the night with him. She would visit Cipriani's apartment for the purpose of baby-sitting for his three children. She was not paid, but since Cipriani was an artist, he gave her pictures. She could not remember what time it was when she would depart, but she would arrive during the dinner hour, usually at 6:00 p. m.

She did not object to her husband bringing his friends to their home to play cards. Previous to his leaving her, he took her and their son on a motor trip. Plaintiff's bed was removed from the bedroom to the porch with his consent. When the bed was removed to the basement, he slept on the couch, which he did even before the bed was removed.

NANCY JACK, called as a witness on behalf of Mrs. Dubinka, testified:

She has known defendant for eight years and plaintiff for five or six years and had occasion to visit their home during their marriage. The last occasion she had to visit their home was during Christmas of 1965 when she expressed admiration for their Christmas tree. Plaintiff responded the "tree doesn't mean anything to me now, if there was a broad there it would mean something." The witness visited defendant a couple of times a week. On two occasions she saw plaintiff, at Christmas and when he drove her and defendant home from a show.

IRENE HARTLEY, called as a witness on behalf of Mrs. Dubinka, testified:

She is defendant's mother and has known plaintiff for 17 years. She would visit the home of plaintiff and defendant at least four times a year for parties or card playing. Plaintiff would come home late and sometimes "stone drunk." On one occasion he came home drunk and joined their card game but could not read the cards. During the Christmas season of 1964, plaintiff

439

was at his home drunk and a bit under the weather. There was a little sarcasm, but it was not too bad. When plaintiff and defendant visited her home, he would leave and not return, or if he did return, he was drunk. This was either during 1963 or 1964. Plaintiff did this on Father's day in 1963 or 1964 and defendant had to go to the tavern and get him. Defendant is very nervous and under doctor's care.

Cross-examination revealed:

Prior to April 1, 1965, defendant would come almost every other week and remain for the weekend. Defendant did not leave the boy with her often, but the boy would come and remain with defendant. Only once did defendant leave the boy with the witness for a weekend.

ALEXANDER DUBINKA, testified on his own behalf as follows:

He lived with defendant until April 11, 1966. During the first two years of their marriage he worked from 5:00 a. m. to 10:00 p. m. His work required the lending and collecting of money for a finance company. He took defendant out regularly and they visited her mother's home every Sunday. They moved to a building owned by his father which was twenty-five miles from his place of employment and required almost one hour and a half each way to reach his destination. His work required long hours and visits to customers.

He became tired of visiting his mother-in-law on holidays instead of his father or sister until 1964 and 1965, when he insisted this be done. In 1961, defendant complained of his long hours and low income. He quit his job and they took a three-week vacation to California where his mother-in-law joined them. He did not invite his mother-in-law, nor did he know she was coming. In 1963 they planned a two-week vacation. However, after visiting some eastern cities, defendant insisted they re-

turn home. To please her and not cause problems, they returned home. He spent the last week of the vacation painting the apartment at defendant's request.

Defendant always complained about his lack of sufficient income and that all her friends had new houses.

In 1964 he was made branch manager which necessitated out-of-town travel, but defendant refused to drive him to the airport. On Memorial Day of 1965 defendant declined his invitation to do something special during the long weekend, but told him that she was going out of town for the weekend with her girl friend and that he could do as he pleased. In 1964, defendant accompanied him on social visits and parties that arose as a result of his employment, but after that year refused to do so. Commencing in 1954, he had to prepare his own breakfast, which she refused to do.

In February, 1966, defendant placed his bed on the porch and refused to replace it in their bedroom. After it was removed from the porch, he slept on the couch.

Commencing with the summer of 1965, defendant refused to spend weekends with him and in November, 1965, defendant insisted on having the car three nights a week because she was playing bridge. Defendant would be out until midnight and on Fridays she did not come home, advising him that she was staying overnight at her mother's home. During the month of February he became suspicious of defendant's activities and borrowed his sister's car in an effort to see where defendant was going almost every Monday, Wednesday and Friday. He could not spend too much time in this regard, because their son was home alone.

In the first week of March he discovered that defendant visited a building containing six apartments. It was a week later that he observed defendant in one of those apartments and discovered it was rented to Mario Cipriani, who was divorced and the father of

441

three children. One Friday evening in March he observed defendant and Cipriani emerge from a car at 8:00 p. m. and walk arm in arm into the apartment building. When he abandoned his vigil at midnight, defendant had not emerged, nor did defendant come home.

On April 12, 1966, he retained the services of a private investigator to monitor defendant's activities. On April 15, 1966, he left defendant and they have been living separate and apart since that date.

Cross-examination revealed:

He was not aware that defendant was ill during their trip to the east coast nor that she was under doctor's care for a nervous disorder.

HUBERT BUMGARDNER, called to testify on behalf of Mr. Dubinka related:

He was retained to conduct a surveillance of defendant. His observations revealed that defendant drove up to Mr. Cipriani's apartment at 6:30 p. m. on April 15, 1966. She stepped from her vehicle carrying a small black valise and entered the apartment of Cipriani, who had preceded her by a half-hour. Defendant and Cipriani were observed in the apartment. She was dancing and twirling while Cipriani was seated; eventually, they danced. At 10:20 p. m. they emerged, entered Cipriani's automobile and drove off. They returned at 12:30 a. m. and again went to Cipriani's apartment. He placed markers on the apartment door after 12:30 and checked them from time to time. They remained intact until 8:00 a. m. when Cipriani came out and drove off. Twenty minutes later defendant departed from the apartment, entered her automobile and drove off.

Cross-examination revealed:

Surveillance was commenced from 100 to 200 feet. After they entered, he moved around to the front of the apartment. He was about fifty feet from the apartment window, which was about five and a half feet

high. He could see a person's body from the waist up. The bottom of the window from the ground was higher than his head.

THERESA DUBINKA, was recalled for further direct examination.

On their trip to the east coast she told plaintiff that she was ill. Plaintiff knew she was taking tranquilizers and could not eat in restaurants. She always made breakfast for plaintiff and their son, but he refused to eat at home.

On April 15, 1966, plaintiff threatened her stating, "You better watch out for me" and he mentioned Cipriani's name; this frightened her. She remained at work until 6:00 o'clock and drove to Cipriani's apartment.

She observed a car parked across the street and its occupant was resting his head as though he were sleeping. She became frightened and told Cipriani that it was plaintiff in the car. She also told Cipriani that plaintiff had threatened to kill her. They both looked at the car and its occupant from the apartment window and then left the apartment. Cipriani drove her to her mother's home. They made arrangements for Cipriani to pick her up in the morning. She remained at her mother's home that night. When she returned the next day to pick up her automobile, she observed the automobile she had seen parked there the previous evening.

In response to questioning of her alleged bridge playing on Monday, Wednesday and Friday, she stated, "I certainly never played bridge that much. I couldn't be out that much, because I was home with my son."

MARIO CIPRIANI, testified on behalf of Mrs. Dubinka as follows:

On April 15, 1966, he arrived at his apartment at 5:00 or 5:30 p. m. Defendant came to his apartment

443

at 6:30 or 6:45 p. m. They observed an automobile parked across the street and could see an occupant but could not discern what he was doing. The blinds were drawn at the time, and in such posture, nothing could be seen from the outside, not even an apartment light when turned on or off. After they both gazed at the automobile, he proceeded to continue on his plans for the evening and took defendant to her mother's home at approximately 8:00 or 9:00 p. m. Nothing at all occurred that night in his apartment.

The automobile containing the occupant was parked 75 to 100 yards from the apartment. The upper third or fourth part of the apartment, towards the ceiling, is what would have been visible from the automobile. Directly in front of the apartment you can only see the ceiling. The apartment window is eight feet off the ground.

Cross-examination revealed:

He has known defendant for two years but they were not planning on marriage in the event she secures a divorce.

Examination of the court revealed:

His children have been at Angel Guardian's Orphanage for one year. Prior to that time they were living with his sister and sister-in-law.

OPINION

The evidence reflects that at the time defendant met Cipriani, her marriage was already reduced to a status of constant bickering, discord and disharmony. Defendant testified she met Cipriani in a library and subsequently met him in a restaurant where they had coffee. She made a holiday trip without her husband to a summer resort; fortuitously, Cipriani appeared there. She could not recall the number of times she visited him at his apartment, but related that the latest she ever remained was 11:00 p. m. All of the foregoing was

444

accomplished without the knowledge of plaintiff, whom she misled by informing him that her frequent nocturnal absences from home were in pursuit of playing bridge and staying overnight at her mother's home.

Prior to plaintiff's surveillance of his wife's evening activities, he asked her if she were really playing bridge and was advised that it was none of his business. To which he replied that "if she were playing bridge, that was fine, but if she were doing anything else she better be careful."

Plaintiff's suspicions were confirmed when he followed defendant and became aware of her visits to Cipriani's apartment. Plaintiff then retained the services of a private investigator.

Defendant testified that plaintiff had been drinking and telephoned her on April 15, 1966. She testified: "He threatened me and said, 'You better watch out for me,' and he mentioned Mr. Cipriani's name, the first he had known him." This recitation is significant in that up to that time defendant and Cipriani had been seeing each other and they obviously believed it was without plaintiff's knowledge. Defendant's immediate flight to Cipriani after this phone call cannot be equated with the actions of a woman wrongfully accused. She did not endeavor to impart her baby-sitting activities to her husband in explanation of her visits, but sought succor and safety from her outraged husband at the hands of Cipriani. There is no evidence that she made any effort to dissipate her husband's belief of her wantonness, and explain her relationship with Cipriani as mere ugly, uncalled for suspicion. Her rush to Cipriani was evidence of her panic and guilt when she became aware that her relationship with Cipriani had been discovered by her husband.

They testified that when they observed an occupant in an automobile parked outside Cipriani's apartment, defendant told Cipriani that she believed it was her

husband who threatened to kill her. Their reaction under these circumstances was bizarre. They peered at the car and its occupant through the blinds, then emerged from the apartment. Cipriani testified he proceeded to continue on his plans for the evening and drove defendant to her mother's home, leaving in their wake an occupant of an automobile they believed to be defendant's outraged husband, who a few hours ago had threatened to take her life. If they had been wrongfully accused, it appears reasonable to assume they would have taken advantage of the opportunity to speak to plaintiff and explain that her visits to Cipriani's apartment were in conjunction with baby-sitting.

At the trial, defendant sought to explain her presence and visits to Cipriani's apartment by attributing them to her baby-sitting for his three children. This was without compensation, except for some pictures he painted and gave her in appreciation of her efforts. Defendant never imparted the foregoing information to plaintiff. The evidence disclosed that one year prior and at the time of trial Cipriani's children were living in an orphanage and previously had been cared for by his sister and sister-in-law.

Defendant cites Blake v. Blake, 70 Ill 618 (1873), Sterling v. Sterling, 177 Md 683, 9 A2d 214 (1939), and Laccetti v. Laccetti, 245 Md 97, 225 A2d (1967), in support of her contention that the fact of mere occupancy of a room or apartment by the accused parties for an undue length of time or overnight is not evidence of adultery.

In Blake, supra, the evidence revealed that Mrs. Blake and her neighbor, Mr. Thompson, took evening carriage rides and walks together and visited at his law office. The testimony of her two sons, 11 and 14, that they observed the parties at midnight reclining fully dressed on a sofa in the library, she with her head on his chest and he with his hand around her waist, was held

446

to have been properly rejected by the jury. The evidence revealed that they had much animosity toward their mother and were under the dominant influence of their father. There was testimony of a private detective who related that he had the parties under surveillance for six months, but only observed that they visited at the office, took walks and carriage rides and on one occasion he saw her friend place his hand on her lap. The court in that case commented that the evidence was very deficient and that the jury properly perceived that the relationship of the accused was not of a criminal character. With the exception of the library incident, the court observed that all their meetings were in public and seemed to be destitute of the characteristics which ordinarily lead a jury to the conclusion that adultery had been committed when the opportunity existed.

On some of their carriage rides, Mrs. Thompson would accompany them. Other evidence showed that the Blake and Thompson families were close friends and neighbors; in fact, the Sunday before Blake ousted his wife from their home, Thompson and his wife dined with the Blakes at their home.

In Sterling, supra, the parties entered into articles of separation and the wife moved to her own apartment with their child. One evening she accepted her neighbor's invitation to attend a party in their adjoining apartment. After all the participants freely engaged in drinking, Mrs. Sterling invited one of the men to visit her apartment upstairs, which invitation he accepted. The apartment had two bedrooms and after a brief conversation, he entered one of the bedrooms and closed the door. She went to the other bedroom and went to sleep with her daughter. In the morning he was found fully clothed, except for his shoes and jacket, sleeping in the bed, and Mrs. Sterling was found sleeping with her child in the bed in the other bedroom. The other incident upon which Mr. Sterling relied to establish his allega-

447

tions of adultery concerned a visit a man made to Mrs. Sterling's apartment a month later. Her husband observed the visitor arrive at 9:00 p. m. and depart at 3:00 a. m. When her husband confronted her with his observations, she readily admitted the visit and stated that she had sewed a button on the visitor's coat, danced, listened to the radio, played cards and that there was nothing wrong. She stated that she had a right to have guests.

The court after a detailed review and commentary of all the evidence and the applicable law said at pages 219 and 220 at 9 A2d:

> "There was nothing secret or clandestine in their meetings, and there is no testimony of proximate familiarities nor of any on the nights in question. Except for the two evenings mentioned, Mrs. Sterling never met nor communicated with either of the two men.

> "An adulterous disposition in a man and woman towards each other does not usually spring into existence on their first meeting. It has duration and does not suddenly end. In this case there is no evidence of affection nor of improper familiarities. Again, the interpretation of the evidence is, at most, open to two views and the one which is consistent with innocence should be adopted." (Cases cited.)

In Laccetti, supra, the evidence revealed that the parties entered into a valid common-law relationship in 1949 and had two daughters born, respectively, in 1950 and 1951. In 1962, the husband left his family and lived with another woman, which provided the basis for the wife's commencement of a divorce action charging her husband with desertion and adultery. On cross-examination, the wife admitted that until a few weeks before the trial, she and her two daughters had been living in the same

house as a Mr. Thurston and his two boys, ages 16 and 14, for approximately one year. The court summoned Thurston to testify, and he related that he had been separated from his wife for about five years and they had three sons, ages 22, 16 and 14. The younger two reside with him in a three-bedroom house which he rents, and Mrs. Laccetti lives in the same house with her two daughters.

Thurston and his sons occupy one bedroom and Mrs. Laccetti's daughters have one bedroom and she occupies the third. Thurston testified that he and Mrs. Laccetti had an agreement whereby she did the ironing and the cooking and took care of the children and that he paid the bills. He and Mrs. Laccetti repeatedly denied that they ever had sexual relations. He testified that his two boys had been in trouble and he had been advised by the Juvenile Court Judge that he could not have custody of his children unless he had someone to take care of them, to cook their meals and look after them. He said "I kept my kids if I got somebody to take care of the kids, and that is just the way it worked out."

The court held that while there was ample evidence as to the opportunity of Mrs. Laccetti and Thurston to commit adultery, there was not an iota of evidence to prove a disposition on their part to commit the offense and, therefore, reversed the trial court.

Unlike the foregoing cases, cited by plaintiff, the case at bar reveals a secretive and clandestine relationship and a deliberate endeavor to mislead and to allay any suspicion of wrongdoing by defendant. It is significant to note that neither this defendant nor Cipriani specifically denied any intimacy.

In Wachowski v. Wachowski, 86 Ill App2d 145, 229 NE2d 149 (1967), the court at page 148 expressed language most appropriate to the case at bar:

"Plaintiff is quite correct in her assertion that before a court will enter a decree based on adultery,

the evidence and proof must convince the mind affirmatively that actual adultery was committed, since nothing but the carnal act can lay the foundation for a divorce on those grounds. Fowler v. Fowler, 315 Ill App 270, 42 NE2d 954. However, we are not unmindful that adultery is an act committed in secrecy and invariably the parties use every means in their power to conceal their act and to prevent discovery. In most all such cases the evidence is circumstantial and the fact of adultery must be inferred from the circumstances that naturally lead to it. The direct fact of adultery can seldom, or ever, be proved. Zimmerman v. Zimmerman, 242 Ill 552, 559, 90 NE 192; Bast v. Bast, 82 Ill 584. The testimony in the record before us leads us to the inescapable conclusion that this plaintiff is guilty of adultery."

In Marcy v. Marcy, 400 Ill 152, 79 NE2d 207 (1947), at page 156, the court said:

"It is contended by the appellant that there is no proof of the charge of adultery. Where adultery is charged, there is very seldom direct or positive evidence of the acts charged. The parties generally use every effort to conceal the act and usually deny that adultery has been committed, or attempt to explain away the circumstances which indicate adultery. In such a case it becomes very important to test the credibility of the witnesses testifying since it can be assumed that the defendant and anyone with whom she is alleged to have committed adultery would deny the charge. The position of the chancellor in such a case, therefore, becomes very important, particularly where he has heard all of the evidence and has had an opportunity to observe the witnesses and their demeanor while testifying, their

450

candor or lack of candor and to consider the circumstances in issue.

"When the facts and circumstances introduced in evidence fairly and reasonably lead to the conclusion that adultery has been committed the court will be justified in finding the charge sustained. (Cooke v. Cooke, 152 Ill 286; Daily v. Daily, 64 Ill 329.) As this court stated in the case of Bast v. Bast, 82 Ill 584, 'The fact of adultery is to be inferred from circumstances that naturally lead to it by a fair inference as a necessary conclusion. The direct fact of adultery can seldom, or ever, be proved.' "

■ We hold that the decree is sustained by the evidence which more than adequately establishes that defendant and Cipriani were disposed to commit the offense charged and had ample opportunity to do so.

Defendant also contends that the trial court erred in disallowing her an award of alimony, since she is dependent upon plaintiff for support.

In a divorce decree the court may enter an order of alimony for the wife and support of any children which from the circumstances of the parties and the nature of the case, shall be fit, reasonable and just. Ill Rev Stats, c 40, § 19 (1965).

■ We find there was no abuse of discretion in denying defendant alimony. Defendant was employed prior to and at the time of her misconduct. The evidence pertaining to her ill health did not reflect any condition that would impede or preclude her employment.

We conclude that the decree was not against the manifest weight of the evidence and, therefore, we affirm the judgment.

Judgment affirmed.

DRUCKER and ENGLISH, JJ., concur.